Good morning. We all set? Good morning, Your Honors. May it please the Court, my name is Robert Kern and I represent the Closson family. I'd like to reserve two minutes for rebuttal. All right, watch the clock. Now, I'm going to move this around a little bit from the briefs in that I'd like to address first the admission of evidence of the Closson's subsequent financial troubles and then address the release defense. I'll be leaving the issue of judicial misconduct to the briefs. The first question that we have to look at today is to decide whether it was an abuse of discretion for Bank of America to introduce irrelevant evidence of a post-breach financial condition of the Closson's when all damages and liability had been established by the date of the breach. The Closson's claimed no damages or anything of the sort from anything occurring post-breach. So now at trial, it was established that the alleged repudiation occurred in March 2008. The completion of construction occurred in April 2009 and that would have been the final date that Bank of America could have rolled over the loan into permanent financing and thus the final date of breach. The financial troubles the Closson's suffered that evidence was introduced for was in September 2009, six months after the final possible breach, a year and a half after the repudiation. This evidence was introduced over objection and this was unrelated to anything claimed by the Closson's. Now the law is clear on this issue. The motion in limine was filed, right? The motion in limine was filed, Your Honor. And the two objections were? I'm sorry, Your Honor? The two objections were irrelevant and prejudicial, right? Correct, Your Honor. And objection when it was admitted was irrelevant. We didn't see any prejudicial. We argued that it was prejudicial in the initial motion in limine. The motion in limine, but not in the objection at trial. Correct, Your Honor. So does that make a difference? Under the law, Your Honor, in the cases cited, we — it's been established in the Ninth Circuit that if an objection is raised and there is a pretrial motion that raises and explains those objections, then it's not absolutely necessary to be specific in the in-trial objection. Go ahead. No, at this time the judge said, you know, as things develop in trial, this is dynamic process, I want to hear objections. That's correct, Your Honor. He did say that and he was going to allow that leeway in the motion in limine. We did, while we just, when saying the objection, said relevance, because we do believe this is irrelevant, I do believe that it's sort of implied that once there's a barrier crossed and even if there's a tiny, you know, speck of relevance. Well, the reason I wanted to speak to it is because of exactly what my good colleague was questioning you about. This is not the normal motion in limine decision by the judge. He was really saying, well, I've heard you. Now I want to hear what you do at trial because I want to see if you're really there, because this is a dynamic situation. And then when we get there, you only say relevance, so I'm worried that you didn't quite do what you needed to do. Well, Your Honor. And if the best argument you have has been made, you don't have to say any more about it. No, that's fine, Your Honor. As far as that, we did only say relevance at that motion, but we did, however, argue that, you know, this is a problem to suggest it. But the part of the problem there is we did ask for a sidebar and were denied that. So we're in the presence of a jury and it's problematic to raise in front of the jury the issues that I don't want the jury to be thinking about. No, it's not hard to say relevance and prejudice. No, you're correct, Your Honor, about that. I take it their argument for relevancy is that, look, the insolvency may have occurred later, but, you know, things don't happen all at once and things develop. And although it may not say everything, it's at least something. It's somewhat connected, whether their damages were their own problem or not. Well, that's not the argument. Well, that argument wasn't actually made, Your Honor. However, it's possible that's what someone was thinking. But, yeah, I would point out that no one made that argument at trial. There was no evidence of that the problems were in existence prior to the breach or at the moment of breach. Michael? But isn't it relevant because it shows your client couldn't have performed the contract in any event? Well, that's where we dispute, Your Honor. I know that's where you dispute. I'm just trying to figure out relevancy is the toughest objection to make. Absolute toughest. I understand, Your Honor. And what I'd point out is that under all law, all law we've been able to find, the Supreme Court in Franconia, through a statement of contracts, corpus juris secundum, every case law we found, and I'll point out no contradicting case law has been brought by Bank of America, that a breach is immediate. If we were to assume that this, what happened nine months after, excuse me, 18 months after the repudiation could undo the breach once it has occurred, then we're going against all that case law. Eight months after there was a failure to complete the construction on time. Correct, Your Honor. Okay. So... Well, doesn't the subsequent insolvency separate the breach from the damage? Well, we were not claiming any damages from the subsequent insolvency. We had claimed damages for the loss of the house, and let me separate here, Your Honors, because there's a difference between the amount of damages we're claiming versus the damage element that satisfies the requirements of breach of contract. In covering the requirements of breach of contract to establish that there was damage, we claim we lost the house and property is unique. Property is unique under the law. The house was lost. There was never an opportunity to retain it because there was never a loan that had any terms that allowed for being paid back, and that was directly due to the breach by Bank of America. We, as far as our calculation of damages, our calculation of damages was the amount of money put into the contract, and that went up until the breach. So there is no link between the later financial issues and the damages that were incurred or damages claimed by the Claussons. So what I'd point out here, Your Honors, is that even if they say that under the law, breach is immediate, all the law sources say breach is immediate, they say that actions or events that occur after a breach cannot make the breach not a breach. So when you say they would have lost the house anyway, what you're saying is, yes, we breached, yes, we were required to do this and we didn't and they lost the house, but look, something happened after this breach had been established and now we're unbreached. But you assume that everything, that what happened later is only evidence of something that happened later. I mean, something that happens later can be evidence of something that's occurring before. Correct? It can be, Your Honor. It doesn't have to be one-to-one. But Your Honor, there was no argument made to that fact and no evidence introduced of anything prior to September 2009. So when we're looking at this, what we're saying is breach is immediate. That's all the law says that. And we have a fairly specific on-point case, although it's a very old one, that's California Richmond Wharf and Dock Company. And this is a situation where you had a very similar situation where you have, he has a contract to reclaim some submerged lands from the bay out here, and they breached the contract, but right after that a law was passed that says you don't get those lands anyway. So they say, hey, no damages. That's an extremely similar situation here because the court ruled, look. Well, it's not quite similar because I, in trying to review, and I think it was that same case, it seems to me that in that case the government intervenes and suggests something different. In this case, it's just the time goes on and it doesn't seem to help your client. Well, I understand that, Your Honor. What I'm citing is the point of law that once the breach is established, something — But when you talk about breach, you're talking about what event? Well, there's two claimed points of possible breach that we could have claimed, which is the date of repudiation, which is March 2008, which was our primary claim, and this construction completion in April 2009. And our primary claim was the repudiation. The breach of contract based on the final date was more of an alternative claim. What you're calling the repudiation is when it became clear the construction would not happen on the original agreed date, the Bank of America would not guarantee that the rate would remain the same. No, Your Honor. Oh, so what's your repudiation? Yeah, what is repudiation? That's kind of how I understand repudiation. Oh, no. What do you think the repudiation is? The repudiation was when my clients asked Bank of America about the terms for rollover since they were getting closer to the completion of construction. And Bank of America said, we won't roll this over unless you come up with $400,000 to $600,000 in a point paydown up front and accept a higher interest rate. Just a second. The whole reason they want rollover is the construction is not going to happen on time. No, Your Honor. Let me clarify that. The rollover, this is a construction of PERM loan. So this is a loan where you have a construction component where they are making draws on the account to get the construction completed. And at the completion of construction, one of the terms of the contract is there is automatic rollover into permanent financing, meaning it becomes a regular mortgage, like if any other person would buy a house. So once it rolls over, it has terms for payback and payments and all those things. But it's not going to rollover to permanent loan if construction is not completed. Correct, Your Honor. We were discussing what would happen... Okay, which is why they needed an extension of time to get construction completed. This was separate from that discussion. There was no dispute about Bank of America and my clients agreed on the extension of construction, which was had provided for in the contract. Okay, they agreed for an extension. And then there was a request for what the new rate would be with the rollover. Is that... Correct, Your Honor. And the breach, you were saying, is what? That they didn't get an answer to that? No, Your Honor. There had been a rollover and they had asked my clients, do you want to pay to protect your rate? If you don't pay, it will float. Right. And they didn't pay. It would float on the market. So the mortgage rates were going down at the time, so they decided they were willing to risk following the market. So they allowed it to float because a floating rate has a standard definition in the mortgage industry of a rate that follows the market. Four months later, they asked, okay, how are we looking here? And Bank of America said, well, your rate has gone up immensely. We're going to charge you eight to ten points. Is that the breach? That's the breach. Is that instant, then the breach occurs? The repudiation was that they said we will not rollover the loan, despite the loan having an automatic rollover, unless you pay us this money. And they said, well, the market's changed. We said, well, the market rate went down and this was a floating rate, so the only change should be down, although the terms say the higher of a face rate or the market rate, so it should be the face rate because the market rate went down. They said, well, we don't offer this loan product anymore because the crash had occurred. They didn't want to make the loan anymore, so instead of treating it following the contract, they said, we don't want to make this loan, so you're going to have to pay us to make us want to. We considered that, the refusal to roll it over. Your damages for that were what? Our damages were we lost the house and we were unable to get any benefit from it. We could have, even with a bad financial situation, they could have done what their next-door neighbor did, which had an almost identical contract with Bank of America. We were both gotten something for their investment, even if their financial condition suffered. I would like to take just a few moments to address the second issue and just point out. But you don't have many moments left, so you go 30 seconds over and you're done. Thank you, Your Honor. As far as allowing the unpled affirmative defense of release, Bank of America is going to try and argue that they argued a signed release constituted a waiver. Please examine the record carefully and note that that is not what occurred at trial. When we argued they're raising an affirmative defense of release, they did not say, oh, no, this is waiver. They said, oh, no, we're not. This is something else. They did not mention this as waiver until the end, until after the close of evidence. Not until a Rule 15 motion after close of evidence did they first come up with the idea of calling this waiver. And we must look at what the judge ruled on on our objection. He said he didn't say this is waiver. He said they can always introduce a Rule 15 motion, so overruled, which we disputed. And later, when they raised it in closing argument, they said the judge ruled based on his idea that there's not really a difference between waiver and release. What difference does any of this make? The jury never got to waiver or anything like waiver. There's the express waiver and there's waiver because they continue to pay, da-da-da-da-da. So he says that when jury fills out the form, they say no breach of contract. They don't say waiver. They don't say anything like that. And that's correct, Your Honor. And that's the problem here is there was no jury instruction on release. So throughout the trial, Bank of America continuously argued that they signed a release and their claims are gone, which is those are the elements of release, not of waiver. They did not apply the terms of waiver or the language of it or indicate that the jury instructions apply to that. The judge let them argue that. That piece of the contract's in evidence. But the jury said there was no breach of contract and no right. Isn't that what the jury did? They did, Your Honors. But we also had Bank of America telling them to decide that if there was — if the Claussens would have lost the house later based on evidence of what happened after the fact, that that eliminates the element of damages. And you also have them putting out this release argument, which a layperson knows about the fact that, oh, if you sign away your rights, then they're gone. And that's why it's so damaging, because they didn't have — But the release says basically you're giving up your claims, your claims for breach of contract. They say there's no breach of contract.  That's what the jury said, no breach of contract. Right. And we believe that there was a confusion of issues for the jury by the fact that they were arguing that this release wipes out everything when that's not the terms of waiver. Waiver says there has to be a knowing relinquishment — excuse me, an intentional relinquishment of a known right. But there was no language in the trial to tell the jury that that's the standard they have to apply this information to. All right. You've had more than your time. Thank you. Thank you, Your Honors. Got some good stuff from you. Good morning. I would like to start on behalf of Bank of America with this concept of damages. It is not correct that only pre-foreclosure damages were claimed at trial. The Claussens asked for, as part of their measure of damages, the tax liability they incurred as a result of the debt forgiveness that came out of the foreclosure. That was not in the pretrial order, and we were a little surprised when a few months later it came up at trial, but it did come up at trial. And Ms. Claussen testified that they received a 1099-C and claimed as damages the debt forgiveness income, the tax liability. And that was really the principal measure of damages. And so the insolvency is directly relevant to refute that claim for damages. Our intention in presenting the Claussens financial difficulties in the September 2009 time period was precisely to show that this property was headed for foreclosure regardless of what Bank of America did or didn't do during the 2008 time frame. And since the damages that were claimed, and I think Mr. Kern, in some of the responses to your questions, said again that part of the damage was the loss of the home. So with respect to damages, we believe that there was high relevance that this was an outcome that they were headed for in any event. Regardless of that, we don't believe you even need to get there, Your Honors, because there was no timely objection to this. We understand that it was raised in the motion in limine, but as you pointed out, the judge, the trial judge basically said we're going to see how trial plays out and this wasn't. Well, they did object to relevance and you're arguing it was relevant. Correct, Your Honor. It was relevant. And we believe that their objection was not made timely at trial. It was made in the motion in limine. The trial judge basically said let's revisit this trial. And at that point, when it was made, it was too late. And that's the same dynamic that I think we have with the release versus the waiver. Well, you know what? The only instruction I saw was really it sounded like it went to only an equitable waiver and not to a legal waiver. It starts off as if it could be both. Waiver is the voluntary and intentional relinquishment of a known right. In order to be effective, a waiver must occur with full knowledge of all material facts. And then it goes on and on to talk about the normal equitable waiver and ends with must have been led to as prejudice, which sounds like an equitable waiver. So the jury was never instructed on release or, if you want to call it, express waiver. I think that's a fair point, Your Honor, but I don't know that it makes – that it constitutes sufficient ground to overturn the jury verdict here for two reasons. The first one is the one that you discussed with Mr. Kern. The jury didn't get there. The jury did not find that there was a breach of contract. And so in the logical sequence of things – and I think our jury verdict form was very clear on this, that you first go through – and they did go through the elements of the breach of contract before even reaching the waiver issue. And those forms are blank because they didn't get that far. They decided there was no breach of contract. There was no breach of the implied covenant. And so – He says you confused them and somehow made the release part of the breach of contract dispute. I don't know what the jury was thinking, Your Honor. That's, in our view, a purely speculative and unsupported suggestion because the verdict form is quite clear. The verdict form does not lump all the claims together, doesn't say really anything that would lead to jury confusion in our view. It says, did they prove a breach of contract? Answer, no. The sequence they had is if they had said yes, then there would have been other questions that they would have asked, and then if we were liable, then perhaps the defense would have come in. I didn't understand exactly what he was saying about what the breach of contract alleged is. What do you think it was? I think – and I don't want to argue my opponent's case for him. I want to know how you understood this. My understanding at trial was that it was presented as an anticipatory repudiation that occurred when the Claussens requested the rate at rollover, and when Bank of America said – disagree with the facts as he presented it. What Bank of America said was we can't give you a rollover rate right now because we have to be at 15 days before completion. And so until there's a construction completion date, we're not going to know what the alternative rate is. It's either the face rate or the rate we're charging for similar loan products 15 days before closing. Fifteen days at the end of construction is down the road. And our client's testimony was that it was unforeseeable because we didn't know. As he put it, there was no house yet. And so it was an estimate. Bank of America gave an estimate and explained – our testimony, our witness explained we looked into – took into account the fact that the market had changed dramatically. We took into account that there was already a demonstrated history of inability to complete construction, credit scores, things of that nature. I think it reads in the transcript as a boat coops of money. You know, the Claussens didn't have a lot of money. And given all of those and the fact that they're not offering this product anymore, they gave them an estimate and said, you know, for 8 to 10 points, which given the size of the loan transfers to – or translates to $400,000 to $600,000, we can give you a certain range of percentage interest rate. If you don't want to pay points, the interest rate will be different. But it was a range that was estimated and it wasn't really a formal offer. But as I understood it, that was the – what they said was the repudiation. At that point, the bank, in their view, walked away from the plain terms of the contract by not offering the face rate. And I think that's what it was. Okay. Well, you're making their case. Okay. But is this a classic – I'm trying to figure out the dynamics here. You just said they didn't have a lot of money. Is this a classic 80s or early century high market boom, that case where they got into this contract? How did the bank get into this in the first place? I think this – I would describe this, and this is – I'm taking a little liberty here. I would describe it as on the edge of classic from that era. This property, if my recollection is right, the raw land alone was several hundred thousands of dollars, probably about three-quarters of a million dollars. And the bank wasn't involved in that. This was a construction loan. The construction loan was for $4.4 million. And this is in Las Vegas. This is not San Francisco. So this was a very, very large and luxurious property. So the Claussons at that point, and some of this came in at trial, were doing very well. Mrs. Clausson herself was in the real estate industry, and this tie lifted all the boats, including Mrs. Clausson's boat. So what Bank of America's business judgment was in getting into this, that I don't know. But it was part of that market. But even for those heady days, I would probably describe this as beyond the classic case. And the damages here, are there tax liability? Because Bank of America didn't collect the 1.9, probably can't collect it under the law, I don't know. Right. The bank 1099-ed. There was no grace for it in those days. And so it was reported as debt forgiveness income. And that's one element of the damage. The other element of the damage, as we understood it at trial, and I think as I understood it from Mr. Kern today, was that they sunk a lot of money into this house and weren't able to realize the benefit of it. And so in both of those instances, we believe the damage here would have occurred. And, in fact, Mrs. Clausson testified at trial that even if the bank had given them the face rate and not gone through any of this point or any other stuff, they would have defaulted and gone into foreclosure anyway. This was a $31,000 monthly payment, which they could make when things were good, and just couldn't make when things were bad. So we don't believe there's really any prejudice here or any basis for you to overturn. It was basically an investment property, and there was a plan to flip it, obviously, if you could never make a $31,000 payment. We think so, Your Honor. That's what you're saying. We believe so. You just said they could never pay the $31,000. So you're saying from the beginning. I'm not sure that I said that, Your Honor. I guess I misunderstood you. They serviced this debt during the beginning of the construction phase, and they ran into problems later. We think testimony came from them at trial that this was going to be a dream house for them and that they were going to occupy. Our business analysis was that it was likely an investment. So there was some dispute over that. I don't know that it made a difference in the verdict. But it was pertinent to the insolvency. Why the insolvency? This is another reason to come back to that, that we believe that was an important discussion, is because our analysis in terms of quoting this rate, as our witness described it, a house that never got built in a market that no longer exists with borrowers that we think are in potential trouble, this was highly relevant to the subsequent insolvency to validate the bank's judgment at the time, particularly since one of the claims was for breach of the implied covenant. Our attempt here was to show that this was a conclusion where the clauses were headed. They were headed there whether the bank did offer them a face rate, whether it offered them any rate. That's where they were headed. To come back to the point on the one thing that worried me, the jury did find no breach of contract, but reading the transcript, what was your best argument, absent the idea of waiver or release, quote-unquote, that there was no breach? The plain terms of the contract. Because they had to, I mean, if they find no breach, his argument is the release was so much a part of that. Right. That's the only way they could have got there. So reading what you said, how you argued it, what was your best argument, there was no breach, regardless of release? I'd say there were, and I appreciate your concern there. The plain terms of the contract state that if construction is not completed timely and there's no rollover, excuse me, there's no interest rate protection, you get one of two rates, either the face rate or the rate the Bank of America is charging for similar loan products. And the bank, when it gave an estimate of what that rate may be, it was only an estimate. It wasn't an actual quote because construction wasn't finished yet. And regardless, the contract simply says you get what we're charging, you get what the bank is charging for similar products at that time. And so by telling the Claussons what that product may be, the bank was not breaching any provision in that agreement. So the jury easily could have found, without any mention of release or waiver or any of that stuff, that the bank never breached when they say they breached because it was only an estimate of what they thought the rate would be. Are you going by page G of the addendum? I mean, paragraph G of the addendum? Basically, if construction isn't completed on time, the lender shall get ‑‑ if the lender so consents, the lender shall designate a new rollover rate for the permanent loan and the interest rate shall not change once it is designated and ba, ba, ba, ba, ba, ba, ba. Prevailing market rate 15 days prior to the construction of the completion date? Right. Okay, so it's all that paragraph G. Horribly written, but that's what it says. Yeah, well, I couldn't even read it. But anyway, that was the ‑‑ so that's what I should concentrate on is paragraph G. Paragraph G is the key paragraph, and what that second part of paragraph G says is, if you don't protect your rate, we do what we're offering when construction completes. And since that date was off in the future, what the bank was telling them was, because this product is no longer offered, because we have, as I think our witness described it, a hypothetical house that doesn't yet exist with borrowers who fit this credit risk profile, this is what we think it's going to be. And I think the presupposition that Mr. Kern made both today at trial, excuse me, both in today's argument and at trial was that when market rates go up and down, that that would apply to all loans. And the key error there is that whatever the Wall Street Journal says for a benchmark, this was not that property. And so ‑‑ And this was the argument you made in closing? Because I tried to then ‑‑ I mean, the jury can come up with its own idea. But I was trying to see, in opening or in closing, is there an argument made that I can suggest the jury could not have got there without release? My recollection, even having read it last night, Your Honor, is that our argument focused on the inability of the Clausens to perform, which, while not emphasizing the plain language of the contract, the fact that I didn't argue it as my primary argument doesn't mean that Mr. Parsons, my witness, didn't explain it to the jury. So the jury had knowledge about that. And there was extensive testimony given about this at trial, Your Honor, from the witness. My argument, in the four seconds I have left, did emphasize that there were no damages here caused by the bank, and that's also an element of a breach of contract. So the jury could have found that. All right. I just wanted to have your argument well in mind, because that was something that was worrying me. I appreciate it, Your Honor. Thank you. All right. Well, I think we've heard from both of you, and you've given excellent arguments, and we appreciate you both and your arguments made. Thank you very much. So this case, Case 1315317, Clausen v. Bank of America, is submitted. And thank you again. And this court is now adjourned. All rise. The court for this session stands adjourned.
judges: Restani, Schroeder, Smith